GALVESTON, H. & S. A. RY. CO. v. BOSHER.

(Court of Civil Appeals of Texas. San Antonio. March 11, 1914. On Motion for Rehearing, April 8, 1914.)

1. MASTER AND SERVANT (§ 278*) — INJURIES TO SERVANT—NEGLIGENCE—EVIDENCE—SUFFICIENCY.

In a personal injury action by the engineer of a passenger train who was hurt in a collision with a freight train, evidence *held* sufficient to establish the negligence of the defendant railroad company.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 954, 956–958, 960–969, 971, 972, 977; Dec. Dig. § 278.*]

2. MASTER AND SERVANT (§ 286*) — INJURIES TO SERVANTS—ACTIONS—INSTRUCTIONS.

A freight train was so long that it would not all go on a switch, and had to "saw by" for a passenger train to pass it. The passenger train ran on past the switch, but did not clear the lower end, and thus the rear of the freight could not be drawn onto the switch, and off the main line. *Held*, that the failure of those in charge of the freight to give signals to protect the rear end in accordance with the company's rules warranted a charge on their negligence.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1001, 1006, 1008, 1010–1015, 1017–1033, 1036–1042, 1044, 1046–1050; Dec. Dig. § 286.*]

3. APPEAL AND ERROR (§ 1170*)—REVIEW—HARMLESS ERROR.

Under rule 62a for Courts of Civil Appeals (149 S. W. x), prohibiting reversals for nonprejudicial errors, the failure of the charge, in a personal injury action by a servant, to define assumed risk must be disregarded, where it informed the jury that, if they found plaintiff guilty of certain things which constituted assumed risk, he could not recover.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4032, 4066, 4075, 4098, 4101, 4454, 4540–4545; Dec. Dig. § 1170.*]

4. TRIAL (§ 194*)—INJURIES TO SERVANT—ACTIONS—INSTRUCTIONS—CONTRIBUTORY NEGLIGENCE.

In a personal injury action by a servant, a charge, that, if plaintiff was guilty of negligence which directly contributed to his injuries, if any, this would not bar recovery, but would only go in diminution of damages, is in substantial accord with Rev. St. 1911, art. 6649, and is not on the weight of the evidence.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 413, 436, 439–441, 446–454, 456–466; Dec. Dig. § 194.*]

5. MASTER AND SERVANT (§ 217*)—INJURIES TO SERVANT—ASSUMPTION OF RISK.

An employé does not assume a risk arising from the failure of the master to do his duty, unless he knows of the failure and the attendant risks, or, in the ordinary discharge of his own duty, must necessarily have acquired the knowledge.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 574–600; Dec. Dig. § 217.*]

6. TRIAL (§ 315*)—VERDICT—EXCESSIVENESS—MISCONDUCT OF JURY.

In a personal injury action by a railroad engineer who had been earning $125 a month prior to the accident, and was reduced practically to invalidism, so that he could not walk in a natural way, and had lost all sexual capacity and power of retaining urine, it did not show misconduct that some of the jurors thought he

---

was entitled to $40,000 or $50,000 damages, although only $25,000 had been claimed; and so an award of $18,000, based on a compromise of the opinion of the jurors, was not the result of misconduct.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 740–742; Dec. Dig. § 315.*]

7. NEW TRIAL (§ 157*)—MOTIONS—HEARING OF EVIDENCE.

Under Rev. St. 1911, art. 2021, providing that, where the ground of the motion for new trial is misconduct of the jury, the court shall hear evidence thereof, it is unnecessary for the court, in determining whether a verdict was the result of misconduct, to hear evidence, where the facts alleged as misconduct did not constitute impropriety.

[Ed. Note.—For other cases, see New Trial, Cent. Dig. §§ 314, 317, 318; Dec. Dig. § 157.*]

On Motion for Rehearing.

8. MASTER AND SERVANT (§ 213*)—INJURIES TO SERVANT—ASSUMPTION OF RISK.

Where a railroad engineer upon signal proceeded with his train, without ascertaining that the track ahead was clear, his conduct, if he was bound to ascertain whether the train ahead had been moved so as to give him a clear track, amounted only to contributory negligence, and not assumption of risk, for assumed risk refers only to those risks of which the servant has knowledge, while contributory negligence refers only to the question whether the servant acted prudently in connection with a certain matter; and hence an instruction of assumption of risk is unnecessary.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 559–564; Dec. Dig. § 213.*]

Appeal from District Court, Bexar County; R. B. Minor, Judge.

Action by G. H. Bosher against the Galveston, Harrisburg & San Antonio Railway Company. From a judgment for plaintiff, defendant appeals. Affirmed.

Baker, Botts, Parker & Garwood, of Houston, and Templeton, Brooks, Napier & Ogden and W. F. Ezell, all of San Antonio, for appellant. John Sehorn, of San Antonio, for appellee.

CARL, J. Appellee, G. H. Bosher, sued appellant, Galveston, Harrisburg & San Antonio Railway Company, for damages, and alleged substantially that on or about November 19, 1911, he was an engineer drawing one of appellant's trains; that at the station of Seguin the engine came in violent contact with the cars of a freight train which was on the main line of the railroad, from which collision he received the alleged serious and permanent injuries complained of; that the train he was drawing was a first-class passenger train, and was entitled to right of way on the main line over an inferior train like the freight train; and that the agents and employés of defendant negligently failed to have said freight train off the main line. It is further alleged that the passenger train was under the control of the conductor in charge thereof, who was negligent in ordering and directing him to go ahead while the freight train was still on the main line; that

the defendant's employés in charge of the freight train were negligent in failing to warn plaintiff of the position of such freight train by having a flagman sent, and by placing torpedoes and fusees on the track; that the engine was defective, and permitted steam to escape so as to prevent seeing ahead, and had a defective headlight, and was an unfit engine.

The answer contained a general demurrer, general denial, and special pleas: That the freight train reached Seguin first, going east, and, since it was a long train, and could not get in the switch on account of its length, it was necessary to "saw by" the passenger train, which means that the passenger train, being shorter, would run in on the main line till its rear cleared the east end of the switch, and then the freight would pull out on the main line behind the passenger train, thus leaving a clear track ahead for the passenger train; that the freight train was stopped while a part of it was still on the main line west of the station, and a brakeman on the freight was sent east down the main line to meet and flag the in-coming passenger train, and he met and flagged the passenger train east of the switch, got on the engine and told the engineer of the situation, and that it was necessary to "saw by" at the station; that plaintiff thereupon pulled his train up to the station, and stopped until the station work was done, but while so stopped the rear end of the passenger train did not clear the east end of the switch, and that appellee did not notify the conductor of the situation, but called for the signal to go ahead, which he received, and that, with full knowledge of the situation and all the facts, he voluntarily and negligently went forward and ran into the rear of the freight train still on the main line before it cleared the switch, and himself produced the accident; that it was his duty not to move his train until he knew the track was clear.

Defendant below also pleaded assumed risk and contributory negligence, and that it was engaged in interstate commerce, and that the accident was not produced by the violation of any statutes of the United States. The jury awarded the appellee $18,000, and, from the judgment based thereon, this appeal is taken.

A long freight train of about 49 cars was on the west-passing track at Seguin, headed east. Brakeman Sowell went down east to the semaphore board, where the in-coming west-bound passenger train stopped in response to the semaphore signal which was against it. He got upon the engine and told appellee of the conditions, and that the freight train was partly on the main track, and that it would be necessary to "saw by." Bosher asked him if he could go on to the regular station stop. Appellee then proceeded to the station, and stopped his engine at the water tank, which was the usual place to

make stops. The rear of the passenger train did not clear the east end of the switch, however; but this appellee did not know. When the passenger train stopped, the freight train was put in motion, but, when it reached near the east end of the switch, stopped because the track was obstructed by the rear end of the passenger train. There was evidence to the effect that it was so dark appellee could not see the freight train after the lighted engine had passed. So we have the east end of the passenger train blocking the east end of the switch, and the rear of the freight train blocking the west end of the switch; the rear of each train being on the main line. It was about 10:40 at night, and appellee says it was very dark. Bosher swore: "But before I came to a stop the conductor of the freight train gave the engineer a signal, and he proceeded to pull out, and that was the last I saw of the train, because the water tank was between me already and his train; there was no possible chance of seeing them." The train stayed at Seguin 15 to 18 minutes. After the engine was watered and oiled, Bosher says he tapped the bell to get a signal, and, receiving a "high ball" from the conductor, pulled out. "When I got the order to proceed at Seguin, I judged that the main line was clear at that time, after getting the order to proceed; there was no other way for me to know that it was blocked. I couldn't see. I had seen the people pull out, and, as I say, from that time I didn't see anything else; when I pulled out, I thought the road was clear." '

Rule 99 of the company is as follows: "(99) When a train stops or is delayed, under circumstances in which it may be overtaken by another train, the flagman must go back immediately with stop signals a sufficient distance to insure full protection. When recalled, he may return to his train, first placing two torpedoes on the rail when the conditions require it. The front of the train must be protected in the same way, when necessary, by the fireman."

"As to what are called 'stop signals,' as referred to here in rule 99, why, any signal—even a signal waived violently, a torpedo, one torpedo, or a red fusee, or any violent signal that is waived across the track, red lamps or red flags—is a stop signal." He says he saw no stop signals as he went west either on main or side track. "A fusee is a red light, like a Roman candle, which is supposed to burn ten minutes in case of danger or in case of stopping a train; there is an iron spike in the center, and when they are thrown they generally stick in the ground." "When I got to the switch and left Seguin, I thought the freight train had passed me." He says further: "That train was on the west-passing track at Seguin, north of me. I suppose that track is 100 yards or more from the main track, where I was."

There was testimony explanatory of what the "high-ball" signal given by the conductor meant, which was to pull out, the track was clear; that, after having been at the station for 10 to 18 minutes, this "high ball" from the conductor meant to go ahead, the track was clear. The railway's rule 85 provides that "a train must not start until the proper signal is given," and it was also in evidence that under the rules an engineer is forbidden to leave the station until he gets a signal for that purpose. Duval, the conductor, said, "When I gave the order to leave Seguin to Mr. Bosher, I supposed all freight trains would be out of the way;" and it was shown that nearly all railroading is done by orders and signals, and that the train is under the control of the conductor; he has full charge of the train. It was also shown that under the company's rule 321 it is the duty of every conductor of every train at a telegraph station to report to the superintendent the arrival and departure of the train through telegraph operator—the time he might leave. Duval did not ascertain if the freight was gone, and that the way was clear, but gave the signal to proceed upon the supposition that the freight train had cleared out for the passage of the superior passenger train of which he was in charge. Keating, the brakeman, knew the freight had not cleared. It was also Brakeman Sowell's duty to have notified Duval, the conductor, of the conditions. In reference to the duty of the brakeman, the conductor said: "I say, in case a flagman had flagged against him, had flagged the engineer, it would be his (the brakeman's) duty to come and notify the conductor too; they always do." This duty of the brakeman is also testified to by Banks. There were no signals given Bosher that the freight was still on the main line, and no torpedoes or fusees were placed between his engine and the freight cars extending on the main line ahead of him.

So, briefly stated, appellee's train came into the station, the engineer knowing that the main line was then blocked at the end of the switch; but Bosher did not know that the rear of his train did not clear the east end of the switch, and while he came in the freight started forward. His train stopped at the station, and the business of the train was transacted; the engine taking water, and the conductor getting his orders. The night was dark, and Bosher says his headlight had gone out, and he had tried to fix the headlight before that night because it was so dim, and that steam was escaping at the time so as to envelop the front, and he could not see ahead. The cause of the escaping steam, he says, was a defective cylinder cock or valve that had been battered and would not seat itself. He had taken charge of the engine at Glidden, east of the place of the accident, and discovered the defects shortly thereafter on the way. The conductor who had charge of the train ordered him by signal to pull out, which he did, and ran into the freight train, injur-

ing him seriously, as shown by different witnesses.

[1] We think the evidence was sufficient to show negligence on the part of the appellant. The conductor had charge of the train. It moved or stood at his command, and, either with or without knowledge on his part that the track was clear, he gave the signal to go ahead, which was tantamount to a command. If he did not know the track was clear, he should have known it. The fact that Bosher gave a bell for orders amounts to nothing more than telling the conductor he was ready to proceed, and asking for instructions. When Duval gave that command to go ahead, he should have known that the way was clear.

We do not wish to be understood as holding that, where the facts of the danger were within the knowledge of Bosher, he would have been justified in proceeding; but the evidence is sufficient for the jury to conclude that he did not know of the danger at the time he got the go-ahead signal. He knew the freight train had been there; but he did not know it was there at the time he obeyed the signal. He saw the other engine pull up, and it was so dark he could not see the unlighted freight cars. He did not know the rear of his train did not clear the switch. There were employés whose duty it was to look after those matters and inform the conductor. The train had been there several minutes, and the conductor had been to the operator and gotten his instructions. It was the brakeman's duty to look after the rear end of the train, among other things, and to inform his superior, the conductor. With all these facilities for knowing and in the face of his duty to know that the track was clear, the conductor ordered him to proceed. There was ample testimony to show negligence on part of the conductor, and to support the finding of the jury. The first assignment is overruled.

[2] The second assignment complains that there was no evidence upon which to base a charge on negligence of the freight train crew, because it is claimed that the undisputed evidence shows that said crew sent out a flagman who did flag the passenger train and tell the engineer of the conditions, and that fusees and torpedoes were unnecessary. We do not view it in that light. Fusees and torpedoes might be said to have been unnecessary at the east end because of the actual warning by the brakeman, Sowell; but we are dealing wtih the other end of the switch, or the space between the passenger engine and the rear end of the freight train. Appellant's argument assumes that the conditions existing at the time Sowell flagged the passenger train had continued. The fact of the matter is that Sowell told Bosher he would have to "saw by," which presupposed a change of those conditions by the freight moving out of the way. And when it did not move out of the way, the appellee had a right to depend on being warned, as the rules of the company required should be done. There were no signals or warnings shown to have been given that the danger was still ahead of Bosher, and he says he could not see it, and did not know of it. It would have been the height of folly if he had gone on knowing the track was blocked, and, when he was ordered to go ahead, and could not see danger, we think the jury was warranted in finding that he was not negligent, but that negligence was shown on part of the freight crew in not keeping a warning that the track was still blocked.

Rule 99 of the railway requires certain duties and signals as hereinbefore set out. Appellant contends that this applies to the track in the rear of and in front of the freight train, but would not apply to the space on the main line in front of the passenger train, and between that point and where the rear of the freight projected onto the main line. But, as long as that freight remained on the main line, signals should have been given or some steps taken to keep the other crew advised of its continued presence. The second assignment is overruled.

[3] By the third assignment of error complaint is made that the court erred in the first paragraph of the charge in failing to define assumed risk; but we do not think the charge, taken as a whole, is subject to this criticism. The charge tells the jury very plainly that, if they find plaintiff was guilty of certain things which of themselves would constitute assumed risk, he could not recover. There certainly could be no material difference between a charge defining assumed risk and one telling the jury that, if they found the elements of assumed risk to be chargeable to plaintiff, he could not recover. The court told the jury that, if plaintiff did those things which would constitute assumed risk, he could not recover. If it was error at all for the court to fail to define in terms what assumed risk is, it would not be sufficient to reverse the case, especially where the constituent elements are given, and the jury is told that, if it finds those things to be true, plaintiff cannot recover. Why say "assumed the risk"? Rule 62a for Courts of Civil Appeals (149 S. W. x).

[4] We have examined assignments 4 to 9, inclusive, and, believing same to be without merit, they are overruled.

The tenth, eleventh, and twelfth assignments attack paragraph 5 of the court's charge as being misleading, and as minimizing defendant's defense, and as giving undue prominence to plaintiff's cause of action. That part of the charge is:

"(5) You are further instructed that, if you believe from the evidence that plaintiff was guilty of contributory negligence which directly contributed to causing his injuries, if any, this would not bar a recovery in behalf of plaintiff, but could only go in diminution of the damages, if any, sustained by the

plaintiff. Therefore, if you find from the evidence that the defendant or its servants were guilty of either or any of the acts of negligence submitted to you herein, and that such act or acts of negligence directly contributed to produce plaintiff's injuries, if any, and that plaintiff did not assume the risk, then you are charged that it is your duty to return a verdict for the plaintiff; and if you further believe from the evidence that plaintiff was guilty of contributory negligence which directly contributed to cause his injuries, if any, the damages awarded him should be diminished in proportion to the amount of negligence attributable to plaintiff."

This charge follows substantially article 6649, and we do not think it was on the weight of the evidence. Anyway it is not pointed out how any particular harm could, or did, result from the giving of same. These assignments will be overruled.

The thirteenth assignment is overruled.

[5] An employé does not assume a risk "arising from the failure of the master to do his duty, unless he knows of the failure and the attendant risks, or, in the ordinary discharge of his own duty, must necessarily have acquired the knowledge." M., K. & T. Ry. Co. v. Hannig, 91 Tex. 347, 43 S. W. 508. See, also, S. A. & A.-P. Ry. v. Wagner, 166 S. W. 24, decided by this court March 4th. Bosher had a right to assume, after he had pulled into the station, and had seen the other train pull up, that the danger either had passed, or that his superiors and other employés whose duty it was to know would inform him, if the danger had not passed. If he could have seen the train or knew of its presence at the time he started his engine, that would materially alter the case. But it was not only dark, but his headlight was out, steam was escaping, and no signals of the danger were maintained. The federal statute differs little from our own. The fourteenth assignment is not well taken, and the same view is taken as to the fifteenth, sixteenth, and seventeenth.

[6, 7] The eighteenth assignment is to the effect that the court erred in refusing to hear evidence as to the misconduct of the jury to show that they were prejudiced, and that some of them voted for $40,000 and $50,000 to induce others who were in favor of low verdicts to come up to $18,000, when the plaintiff's attorney had only asked for $25,000. The injuries of appellee seem to have been well established. By reason of his injuries he was reduced from a strong man who was earning about $125 per month practically to invalidism; he cannot walk in a natural way, nor at all without artificial assistance, and his sexual powers seem to be destroyed. He suffers from incontinence of urine, and is a neurasthenic. All counsel proposed to prove by the jurors was that some had voted for a high verdict, and others for a low one, and that a compromise was made on $18,000. We are cited to article 2021 of the Revised Statutes of 1911, which provides that, "where the ground of the motion is misconduct of the jury or of the officer in charge * * * the court shall hear evidence thereof." The mere fact that jurors vote for different amounts, some high and some low, and then compromise on an intermediate amount, does not show misconduct; and, if appellant could have shown by the jurors all that was alleged, it would not amount to misconduct. The jurors had heard the evidence, and seen the injured man. We must assume that they were honest in their judgment until the contrary is alleged and proven. If some of them believed he was entitled to a higher amount than the attorney asked for, that would not justify the assumption that they were dishonest or prejudiced in the absence of a showing to that effect, and that the verdicts contended for were not justified under the facts. If all the facts alleged were proven, and yet would not show misconduct, the court will correctly refuse to hear evidence. And we do not think the court erred in refusing to hear evidence in this case, when, if everything had been proven appellant contended for, it would not show such misconduct as to require a new trial; and the nineteenth and twentieth assignments will likewise be overruled. The twenty-first assignment, complaining that the verdict is excessive, is disposed of adversely to appellant by what we have said under the eighteenth assignment of error.

The remaining assignments of error, from twenty-second to thirty-third, both inclusive, have been carefully examined, and we do not find anything therein that would require a reversal.

The judgment is affirmed.

### On Motion for Rehearing.

[8] Appellant insists that the court erred in refusing and failing to give its specially requested charge No. 6, which is set out in the fourteenth assignment, and is, caption omitted, as follows: "You are instructed that one entering the employment of a railway company who is at the time engaged in interstate commerce assumed all the risks ordinarily incident to the business in the manner in which it is conducted, of which he has actual knowledge, or, in the ordinary discharge of his duty, must necessarily have acquired knowledge. Therefore, if you believe from the evidence that the plaintiff was notified by brakeman Sowell that the freight train did not clear the main line at the west end of the west-passing track, and if you further believe from the evidence that the plaintiff ran his engine into said cars at said point without knowing that the freight train had cleared the main line at the time and place he did, and if you further

believe it was his duty to have known that said track was clear before proceeding past that point, then you are instructed that the plaintiff assumed all risk of running his engine and train over the main line at said point without knowing that said track was clear; and in that event you will return a verdict in favor of the defendant."

It is contended that it is a controverted issue as to whether it was the duty of appellee to know that the track was clear, and that, if such was his duty, and he ran his train into the other without first ascertaining if the danger had passed, he assumed the risk, and could not recover on account of the Employers' Liability Act approved April 22, 1908.

"Assumed risk refers to a general course of action in connection with the master's way of doing business and the appliances furnished; contributory negligence refers to the question as to whether the servant acted prudently in connection with a certain matter that arose for his consideration at a certain time and place. The first is an intelligent choice; the latter is carelessness."' El Paso & Southern Ry. Co. v. Foth, 101 Tex. page 137, 100 S. W. 173. There is no evidence that Bosher knew the way was still blocked at the time he pulled out with his train. The doctrine of assumed risk rests upon knowledge, because a risk cannot be assumed, unless the one assuming same has knowledge thereof. But we are told that there was evidence introduced strongly tending to show that it was appellee's duty to know that the track was clear before proceeding with his train; to which we answer that, if such was his duty, and he did not perform it, he would be guilty of contributory negligence. But he would not be guilty of assuming the risk, unless he had knowledge of the presence of the train at the time he put his train in motion. There is no testimony that he had such knowledge, although he did know it had been there. "Assuming the risk of an employment is one thing, and quite a different thing from incurring an injury through contributory negligence." If appellant's witnesses are correct that it was Bosher's duty to know that the track was clear, and he did not perform that duty, he was guilty of contributory negligence. The court charged on that subject: "One having full knowledge of defects in machinery with which he is employed may yet use the utmost care to avert danger which they threaten. Assumption of the risk and contributory negligence approximate where danger is so obvious and imminent that no ordinarily prudent man would assume the risk of injury therefrom, but where the danger, though present and appreciated, is one which many men are in the habit of assuming, and which prudent men who must earn a living are willing to assume for extra compensation. One who assumes the risk cannot be said to be guilty of contributory negligence, if, having in view the risk of danger he assumed, he uses care, reasonably commensurate with the risk, to avoid injurious consequences. One who does not use such care, and who by reason thereof suffers such injury, is guilty of contributory negligence." Narramore v. Cleveland, etc., Ry. Co., 96 Fed. 298, 37 C. C. A. 499, 48 L. R. A. 68.

So, if it was Bosher's duty to know that the freight train had gone, and he did not so ascertain that fact, would he not then be guilty of contributory negligence? And if assumed risk rests on knowledge, and none is shown in this case, on part of appellee, as to the continued presence of the other train, we do not see that a charge on assumed risk as to this phase of the case would be applicable. Assumed risk is a contract which may be expressed or implied; but contributory negligence is the breach of a legal duty imposed by law upon the servant.

Therefore, if appellant is correct that the evidence is conflicting as to the duty of Bosher to have known whether the track was clear at the time he put his train in motion, it would only have called for a charge on contributory negligence, which was given.

The motion is overruled.